THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
Eastern Division

| | |
|---|---|
| MOUNT VERNON SPECIALTY INSURANCE COMPANY | ) ) ) |
| Petitioner, | ) ) |
| v. | ) Case No.: 4:22-cv-583 ) ) |
| CHIPPEWA LOFT LLC | ) ) ) |
| Respondent. | ) |

**COMPLAINT FOR DECLARATORY JUDGMENT**

**Comes Now,** Mount Vernon Specialty Insurance Company, pursuant to Rule 57 of the Federal Rules of Civil Procedure, and in support of its Complaint for Declaratory Judgement under Policy DPS4000875B as it pertains to Claim K165932, states the following:

**Parties**

1. Petitioner Mount Vernon Specialty Insurance Company is a Nebraska corporation with its principle place of business in Pennsylvania and is a citizen of Nebraska for purposes of 28 USC §1332 (c).

2. Respondent Chippewa Loft LLC is a Missouri corporation with its principal place of business in the state of Missouri and is a citizen of Missouri for purposes of 28 USC §1332 (c).

**Jurisdiction and Venue**

3. The court has subject matter jurisdiction pursuant to 28 USC §§1332 and 2201 (a) – Mount Vernon seeks a declaratory judgement against a diverse party, as to its obligations to pay for losses incurred by Chippewa which are in excess of $75,000, exclusive of interest and costs.

4. Pursuant to 28 USC §1391, venue is appropriate in this court as defendant resides in this

district and the loss occurred within this district.

## Nature of the Controversy

5. This matter involves a dispute regarding a Surplus Insurance Lines policy that includes a Functional Building Valuation Endorsement wherein the measure of damages is neither replacement cost nor actual cash value but rather, functional replacement.

6. This dispute follows a partial loss caused by vandalism by fire to a vacant building in St. Louis Missouri, and the respective duties and obligations of each party to the other, under the plain meaning of the insurance contract, specifically:

    A. The application of the plain and ordinary meaning of the Functional Building Valuation Endorsement.

    B. The sufficiency of the insurer's payment to the insured of the building's market value.

    C. The insured's failure to complete duties after loss—including to cooperate and to present its damages.

    D. The resulting prejudice to the insurer caused by the insured's failure.

## Relevant Background Facts Common to All Issues

*Vacant Building*

7. The property at issue in this case is a one-hundred and fifteen-year-old, stone/masonry church built in 1907 located on 500 N. Kingshighway Boulevard, near the intersection of Washington Avenue, in Saint Louis Missouri 63108 ("Vacant Building")

8. At the time of the loss, the building's improvements were in fair condition but in need of significant, interior renovation. The building's electric and mechanical systems also needed replacement.

9. Further, the building is historic and as such is unique and comprised of many obsolete construction materials and systems. As such, it required specialty insurance.

*Mount Vernon Policy*

10. On November 27, 2020, Mount Vernon Specialty Insurance Company issued Chippewa Loft LLC, a Surplus Lines policy insuring the Vacant Building for $2,500,000.00 ($2.5 million) with a deductible of $25,000, policy #DPS4000875B. ("Policy") A true and complete copy of said Policy is attached hereto and incorporated herein by reference as Exhibit A.

11. Mount Vernon's Surplus Lines Insurance is a segment of the Missouri insurance market where an insured may obtain coverage from an unadmitted, out-of-state insurer for a risk that traditional or standard insurers are unable or unwilling to insure.

12. The policy has a relevant period of November 27, 2020 through November 27, 2021 and carries certain exclusions and limitations including but not limited to debris removal, mold, excavation, foundations, underground pipes, law & ordinance, and land.

13. The policy employs "functional replacement" as the method of calculating damage—versus more common policies that utilize "replacement cost" or "actual cash value" as the method of calculating damages.

14. In addition to the timely payment of premiums, the policy requires the insured perform certain duties after loss (known as "conditions precedent") including but not limited to mitigate and protect the property from further damages, cooperate with the insurer, in the

claim and submit to a scope/estimate/inventory of damages or inventory of damages claimed. See relevant policy language:

> \*\*\*
> 3. **Duties in the Event of Loss or Damage**
>    a. You must see that the following are done in the event of loss or damage to Covered Property:
>    \*\*\*
>    (3) As soon as possible, give us a description of how, when and where the loss occurred.
>
>    (4) Take all reasonable steps to protect the Property from further damage…
>
>    (5) At our request, give us complete inventtories of the damaged and undamaged the property. Include quantities, costs, values and amount of loss claimed.
>
>    (6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records…
>
>    (7) send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.
>
>    (8) cooperate with us in the investigation or settlement of the claim.

15. Most important to this dispute, the policy contains a Functional Building Valuation Endorsement ("FBVE") which affixes the valuation of damage commonly known as "functional replacement." Under such valuation methods, and in the case of a partial loss, a functional replacement, rather than an identical replacement is afforded. See Page 5 of Exhibit A.

16. Pursuant to the express terms of the policy, if the insured contracts to repair the damages caused by the covered loss, subsection (a) of the FBVE provides the following:

> **FUNCTIONAL BUILDING VALUATION**
> \*\*\*
> With respect to the building described in the Declarations, **Section E. Loss Conditions, 7. Valuation**, items **a**. and **b**. are deleted in their entirety and replaced with the following:
>
>> a. If you contract for repair or replacement of the loss or damage to restore the building shown in the Declarations for the same occupancy and use, within one hundred eighty (180) days of the damage, unless we and you otherwise agree we will pay the smallest of the following:
>>
>>> 1. The Limit of Insurance shown in the Declarations as applicable to the damaged building.
>>> 2. In the event of a total loss, the cost to replace the damaged building on the same site with a less costly building that is functionally equivalent to the damaged building.
>>> 3. In the event of a partial loss, the cost to repair or replace the damaged portion of the with less costly material, if available, in the architectural style that existed before the loss or damage occurred.
>>> 4. The amount you actually spend that is necessary to repair or replace the lost or damaged building with less costly material if available.
>
> \*\*\*

17. However, if the insured does <u>not</u> contract to repair the damages caused by the covered loss, and instead elects to receive a sum of money for the damages, subsection (b) of the FBVE provides the following:

> **FUNCTIONAL BUILDING VALUATION**
> \*\*\*
> With respect to the building described in the Declarations, **Section E. Loss Conditions, 7. Valuation**, items **a**. and **b**. are deleted in their entirety and replaced with the following:
> \*\*\*
>
>> b.  If you do not make a claim under a.1., a.2., a.3., or a.4., above, we will pay the smallest of the following, 1., 2., or 3.:
>>
>>> 1. The Limit of Insurance shown in the Declarations as applicable to the damaged building;
>>> 2. The "market value" of the damaged building, exclusive of the land value, at the time of loss; or
>>> 3. The amount it would cost to repair or replace the damaged building on the same site, with less costly material in the architectural style that existed before the damage occurred, less allowance for physical deterioration and depreciation.

> \*\*\*
>
> The following Definition is added to Section E.Loss Conditions, 7. Valuation:
>
> "Market Value", as used in this endorsement, means the price that the property might be expected to realize if offered for sale in a fair market.
>
> \*\*\*

18. Pursuant to the express terms of the policy, a condition of appraisal is the selection of a competent and impartial appraiser:

> **MISSOURI CHANGES**
>
> \*\*\*
>
> D. Except as provided in E. below, the **Appraisal** Loss Condition is replaced by the following:
>
> **APPRAISAL**
>
> If we and you disagree on the value of the property or the amount of loss ("loss"), either may make written demand for an appraisal of the loss ("loss"). In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of the written demand for appraisal. The two appraisers will select an umpire. If they cannot agree upon an umpire within 15 days, we or you may request that se- lection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss ("loss"). If they fail to agree, they will submit their differences to the umpire. The umpire shall make an award within 30 days after the umpire receives the appraisers' submissions of their differences. A decision agreed to by any two will be binding.
> Each party will:
> 1. Pay its chosen appraiser; and
> 2. Bear the other expenses of the appraisal and umpire equally.
> If there is an appraisal, we will still retain our right to deny the claim.
>
> \*\*\*

*Fire Loss*

19. On October 26, 2021, the vacant, 115-year-old church sustained a partial loss by vandalism—an arson fire to its bell tower, which caused the bell tower to sustain structural damage and require its demolition.

20. The main church building also sustained isolated light smoke and water damage in the surrounding areas.

21. On October 26, 2021, Chippewa reported the loss to Mount Vernon, and the insurer opened a claim, Claim Number: K165932.

*Initial Investigation and Adjustment*

22. Mount Vernon retained Douglas Maestas of Signature Adjustment Group (SAG), to begin the lengthy process of inspecting and investigating such an extensive and complex loss and adjusting the claim pursuant to the terms of the Functional Building Valuation Endorsement.

23. Mount Vernon retained structural engineer, Jason Watson P.E. with ProNet Group Inc. to inspect and ensure the building was sound and secure and fit for repair.

24. Mount Vernon also retained the real estate firm of Lauer, Jersa & Associates to determine the market value for a functional replacement building.

25. Mount Vernon informed Chippewa that due to the sheer size and complexity of the structure (~39,000 sq ft), its pre and post loss damages/condition, and attendant investigations and safety protocols, the adjustment of the claim would likely take several weeks.

26. Mount Vernon advised Chippewa of its duties after loss set forth in the policy and encouraged Chippewa to expeditiously document its damages (including the cost, value, quantities, and amount of loss claimed) and present it to Mount Vernon, as soon as possible.

27. Mount Vernon also encouraged Chippewa to begin mitigation procedures to protect the building from further damage.

*Non-Cooperation on Behalf of Insured*

28. Chippewa notified Mount Vernon that it retained a public adjuster, Paul Abrams, with Edwin Claude Inc., to assist the corporation in preparing and presenting its claim, in exchange of a 10% interest in all insurance proceeds received.  A redacted copy of the Engagement

Agreement between Chippewa and Edwin Claude served on Mount Vernon is attached hereto and incorporated herein by reference as Exhibit B.

29. Pursuant to the terms of the Edwin Claude Engagement Agreement, Paul Abrams/Edwin Claude is vested with the sole authority to speak and act on behalf of Chippewa, LLC in all matters related to this loss and claim, including the negotiations and payment thereof.

30. As such, Mount Vernon inquired with Paul Abrams/Edwin Claude on the status of a mitigation plan and the presentation of Chippewa's claim.

31. Paul Abrams/Edwin Claude declined mitigation services and refused to prepare and present a scope/estimate/inventory of damages—insisting on seeing Mount Vernon's scope and estimates first.

32. Paul Abrams/Edwin Claude demanded "the immediate payment of policy limits, $2.5 million" while simultaneously reserving the insured's 'right of election' to have Mount Vernon serve as the general contractor and oversee repairs to the building if Mount Vernon did not offer enough money on the claim.

33. Several weeks passed, during which the safety and security of the structure was assured, cause and origin investigations completed, and SAG's inspections and assessment got underway.

34. Early, but incomplete assessments, from SAG suggested the cost to repair the covered damages, with the relevant standard of materials was likely between $800,000 and $1 million dollars but the adjustment was still ongoing, and it was unclear as to what damages the insured was claiming were caused by the partial loss and which the insured believed/acknowledged were pre-existing.

35. Paul Abrams/Edwin Claude remained unwilling to prepare and present a scope/estimate/inventory of damages claimed on behalf of the insured.

36. Further complicating matters, Paul Abrams/Edwin Claude continued to "reserve the insured's right to have Mount Vernon serve as the general contractor and oversee repairs" if Mount Vernon did not offer enough money on the claim.

37. In fact, as time went by, every request for information or cooperation was met with a deluge of emails consisting of argument, conjecture and demands to receive Mount Vernon's scope before the insured would present its claim, along with legal hypotheticals and arguments, and demands for the immediate payment of $2.5 million and incomplete and premature demands for appraisal.

38. The demands for appraisal were made without the presentation of damages, and requite inventory/estimate of covered damages, costs, values, and quantities, and were not accompanied by the identification of a competent and impartial appraiser to serve on Chippewa's behalf.[1]

39. Eventually, Paul Abrams/Edwin Claude did submit a scope of repairs to restore the building to like new condition.

40. However, Abrams' Scope was incomplete and failed to account for pre-existing conditions or support a policy limits demand as it:

   A. did not inventory the individual damages, costs, values, or quantities.

   B. contained no financial information/associated costs.

---

[1] Mr. Abrams named himself as the appraiser despite his pecuniary interest in the claim, which is expressly prohibited by Missouri law. <u>TAMKO Bldg. Products, Inc. v. Factual Mut. Ins. Co</u>., 890 F.Supp.2d 1129 (E.D. Mo. 2012).

    C.  utilized the improper value of materials—like kind and quality versus "less costly with allowance for physical deterioration and deprecation."

    D.  included damages unrelated to the loss and not covered by the policy.

41. Efforts to raise these issues with Paul Abrams/Edwin Claude Inc., were wholly unsuccessful.

*Good Faith Payment Under the Functional Replacement Endorsement*

42. In January of 2022, Lauer, Jersa & Associates submitted its market value report of the vacant building in the amount of $900,000.  A true and complete copy of said Market Value Report is attached hereto and incorporated herein by reference as Exhibit C.

43. Mount Vernon was still awaiting a final report from Mr. Maestas at SAG.[2]

44. As such, for the next two months, Mount Vernon retained local counsel to assist in securing the insured's cooperation via Mr. Abrams/Edwin Claude—with no success.

45. In March of 2022, Mount Vernon elected to move forward with payment of "the undisputed" damages the company believes it owed the insured based on the vacant building's market value, as a sign of good faith.

46. On March 25, 2022, Mount Vernon issued payment in the amount of $875,000, (the market value minus stated deductible) delivering the same to the insured via Paul Abrams/Edwin Claude on April 1, 2022, along with a copy of the Functional Building Value Endorsement.

47. Paul Abrams/Edwin Claude confirmed receipt but denied sufficiency claiming the ACV of the building exceeded the policy limits of $2.5 million, and as such, Mount Vernon was in breach of the insurance policy.

---

[2] Without the insured's cooperation or claimed damages via Paul Abrams/Edwin Claude, Mr. Maestas' findings are ongoing and unfinished.

48. Since that time, Mount Vernon and/or retained counsel for Mount Vernon has received more than twenty (20) written demands from Paul Abrams/Edwin Claude for the immediate payment of the remaining $1.625 million.

49. None of these demands have been accompanied with the presentation of damages—the requisite inventory/estimate of covered damages, costs, values and quantities or the appointment of a competent and impartial appraiser.

50. On May 24, 2022, Chippewa produced a market value report recently prepared by St. Louis Greater Appraisal however, the report does not provide the "market value of the damaged building, exclusive of land value, at the time of loss" and was not accompanied by the appointment of a competent and impartial appraiser but demands of immediate payment of policy limits and the threat of imminent litigation.

51. As a result, Mount Vernon now comes to this Honorable Court and seeks a judicial declaration that the company has fulfilled its obligations to the insured as it pertains to the October 26, 2021 fire loss.

**Relevant Law & Application of Policy**

*Interpretation of an Insurance Policy*

52. The interpretation of an insurance policy is a matter of law. *Mendenhall v. Property and Casualty Ins. Co. of Hartford*, 375 S.W.3d 90, 92 (Mo. banc 2012). The general rule in interpreting insurance contracts is to give the language of the policy its plain and ordinary meaning. *Gavan v. Bituminous Cas. Corp.*, 242 S.W.3d 718, 720 (Mo. banc 2008).

53. Definitions, exclusions, conditions, and endorsements are necessary provisions in insurance policies. If they are clear and unambiguous within the context of the policy as a whole, they

must be enforced as written are enforceable. *Todd v. Mo. United Sch. Ins. Council*, 223 S.W.3d 156, 163 (Mo. banc 2007).

54. While Missouri law is replete with cases involving policies that calculate partial losses on a replacement cost or actual cash value basis, in Missouri, functional replacement cost provisions are also valid and enforceable. *Bond v. Liberty Ins. Corp.*, 272 F. Supp. 3d 1112, 1129 (W.D. Mo. 2017). See also *Indian Harbor Ins. Co. v. Clarinet, LLC*, No. 4:07CV581MLM, 2009 WL 398492 (E.D. Mo. Feb. 17, 2009).

55. Functional replacement is a valuation employed in surplus lines policies for buildings such as the vacant building in this case, that may have unique or obsolete construction materials; where there is a large difference between replacement cost and actual cash value; when replacement and/or actual cash value policies on such a structure would be unattainable or cost prohibitive. § 17:37. Property insurance, 2 Religious Organizations and the Law § 17:37 (2d)

56. In the case at hand, there is no evidence Chippewa has entered a contract for the repair of the vacant building as:

    A. Chippewa has not presented Mount Vernon a contract for repair.

    B. Chippewa performed no mitigation to the Vacant Building.

    C. Chippewa performed no remediation of the smoke and water damage, and

    D. The Vacant Building appears as it was the day after the loss, plus six months of decay and mold.

57. As such, pursuant to the plain and ordinary language of the FBVE, Mount Vernon is obligated to pay Chippewa the smallest of the limit of insurance, the market value, or the amount it

would cost to repair the vacant building (subject to relevant exclusions and limitations) with less costly material in the architectural style that existed before the damage occurred, less allowance for physical deterioration and depreciation.

58. Based on the extensive market value report of third-party Lauer, Jersa & Associates, a Commercial Real Estate Appraisal company in St. Louis, the vacant building had a market value of $900,000 "as is" and in fee simple.

59. As such, Mount Vernon's payment of $875,000—the market value of $900,000 minus the policy's stated deductible satisfies the insurer's obligation under the relevant policy endorsement.

*Failure to Complete Conditions Precedent*

60. Under the plain and ordinary language of the Mount Vernon policy, Chippewa has duties after a loss including, but not limited to, an obligation to:

    A. to mitigate damages and protect the building from further damage.

    B. provide "a detailed list of the damaged, destroyed, or stolen property, showing the quantity, cost, actual cash value and the amount of loss claimed."

    C. to cooperate with the insurer.

    D. prepare and produce an executed Sworn Statement in Proof of loss, containing the information we request to investigate the claim.

61. Conditions requiring the insured to complete certain duties—to present its damages and providing information in support that is needed to adjust the loss—are valid and enforceable. *Wiles v. Capitol Indem. Corp*., 215 F. Supp 2nd 1029, 1032 (2001). When the

insured refuses to complete its duties after loss, thereby prejudicing the insurer, the policy is voidable. Id.

62. Beyond repeated policy limit demands and emails with legal arguments concerning ACV, the valued policy statute, and premature/invalid appraisal demands, Chippewa (vis-à-vis adjuster Mr. Abrams/Edwin Claude), refused to cooperate in any meaningful way *or* to perform its duties after loss.

63. For example, Chippewa refused:

   A. to mitigate smoke and water damages and protect the building from further damage.

   B. to make an election to repair or receive a sum of money.

   C. to prepare and produce an inventory of its damages, costs, values, or quantities that it claimed.

   D. to provide financial information or associated costs under the under the functional building valuation endorsement policy.

64. As a result of these failures, Mount Vernon incurred additional costs and expenses associated with the work of SAG and Lauer, Jersa & Associates, as well as attorney fees, in attempting to adjust the claim fully and fairly, in addition to the costs and expenses associated with the bringing of this lawsuit.

65. As a result of this prejudice, Chippewa should be precluded from seeking additional damages under the very policy its has violated, with respect to the October 26, 2021, fire and claim K165932.

*Preservation of Any and All Additional Coverage Defenses*

66. Due to Chippewa's refusal to cooperate and/or provide any relevant information with respect to this loss and the damages claimed, Mount Vernon may have other applicable defenses to void, limit, or exclude coverage and/or damages—that are unknown at this time.  Mount Vernon hereby affirmatively states it reserves and does not waive any such defenses.

*Declaratory Judgment is Proper*

67. An actual and justiciable controversy exists between Mount Vernon Specialty Insurance Company and Chippewa Lofts LLC, and litigation as to this controversy is imminent and inevitable.

68. All necessary and proper parties are before the Court.

69. Resolution of the matters raised in this action will dispose of all issues between the parties.

**WHEREFORE**, Mount Vernon prays this Honorable Court declare the rights of parties under the Policy and to enter Judgment finding, adjudicating and declaring:

A. The Functional Value Building Endorsement is valid and enforceable.

B. Mount Vernon properly applied the Functional Value Building Endorsement as written with regard to Claim K165932 under Policy DPS4000875B as it pertains to the vandalism by fire loss of October 26, 2021.

C. Mount Vernon's payment of $875,000, based on the market value report of Lauer, Jersa & Associates, meets, and conforms with the plain and ordinary language of the Functional Value Building Endorsement of policy DPS4000875B.

D. Mount Vernon's payment of $875,000, based on uncontroverted market value report of Lauer, Jersa & Associates, satisfies its obligations to Chippewa Lofts LLC with regard

  to Claim K165932 under Policy DPS4000875B as it pertains to the vandalism by fire loss of October 26, 2021.

E. Chippewa Lofts LLC's market value report does not provide the "market value of the damaged building, exclusive of land value, at the time of loss" as required by the terms of the Functional Value Building Endorsement.

F. Chippewa Lofts LLC's demands for appraisal did not meet the condition of selecting a competent and impartial appraiser as required by the terms of the Policy.

G. Chippewa Lofts LLC, via its public adjuster Paul Abrams/Edwin Claude failed to meaningfully complete its duties after loss—including but not limited to:

  I. to mitigate smoke and water damages and protect the building from further damage.

  II. to make a timely election to repair or receive a sum of money.

  III. to prepare and produce an inventory of its damages, costs, values, or quantities it claimed damaged as a result of the covered loss.

  IV. to provide financial information or associated costs under the under the functional building valuation endorsement policy.

  V. To cooperate with Mount Vernon with regard to claim K165932.

H. Said failure prejudiced Mount Vernon by requiring Mount Vernon to incur additional costs and expenses with adjusting the claim, including additional work by third-party adjusters and the retention of counsel to secure Chippewa's cooperation and presentation of its damages, and further, to bring this action to resolve the controversy caused by Chippewa's failure.

I. As such, policy DPS4000875B is hereby voided, and Chippewa Lofts LLC (or any third party on its behalf or interest) is precluded from making a claim or filing a lawsuit for additional damages or supplemental payments as it relates in any way to the October 26, 2021 vandalism by fire loss, claim K165932and/or policy DPS4000875B.

**RESPECTFULLY SUBMITTED,**

*/s/ Ellen J. Brooke*

| | |
|---|---|
| Ellen Jean Brooke | #58901MO |
| Katherine M. Smith | #57881MO |

**RYNEARSON, SUESS, SCHNURBUSCH & CHAMPION L.L.C.**
500 N. Broadway, Suite 1550
St. Louis, Missouri 63102
Phone:  (314) 421-4430
Fax:  (314) 421-4431
ebrooke@rssclaw.com
ksmith@rssclaw.com

*Attorneys for Plaintiff Mount Vernon Specialty Insurance Company*