UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MOUNT VERNON SPECIALTY INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) )  Case No. 4:22-cv-583-SEP |
| CHIPPEWA LOFT LLC, | ) ) ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

Plaintiff Mount Vernon Specialty Insurance Company filed this action for a declaratory judgment against Defendant Chippewa Loft LLC, seeking a declaration of the parties' rights under an insurance policy issued by Mount Vernon to Chippewa. Doc. [1]. Chippewa moves to dismiss Mount Vernon's complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Doc. [9]. For the reasons set forth below, Chippewa's motion is denied.

**FACTS AND BACKGROUND**[1]

Mount Vernon is a Nebraska corporation with its principal place of business in Pennsylvania. Doc. [1] ¶ 1. Chippewa is a limited liability company, and its sole member, Gurpreet S. Padda, is a citizen of Missouri. *Id*. ¶ 2. At all times relevant, Chippewa owned a vacant building—a stone and masonry church—in St. Louis, Missouri, located near the intersection of Kingshighway Boulevard and Washington Avenue. *Id*. ¶¶ 6-10. On November 27, 2020, Mount Vernon issued an insurance policy to Chippewa, insuring the building for $2,500,000 with a deductible of $25,000. *Id*. The policy had a relevant period of November 27, 2020, through November 27, 2021, and it carried certain exclusions and limitations. *Id*. ¶ 12.

As alleged by Mount Vernon, the policy included a functional building valuation endorsement (FBVE), and it employed a "functional replacement" method for calculating damage, as opposed to methods such as "replacement cost" or "actual cash value." *Id*. ¶ 15. Under a functional replacement method, in the case of a partial loss, a functional replacement of the damaged property is afforded, not an identical replacement. *Id*. The policy also required

---

[1] For purposes of the motion to dismiss, the Court takes the factual allegations in the Complaint, Doc. [1], to be true. *See Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

Chippewa to perform certain duties in the event of a loss, including taking reasonable steps to protect the property from further damage; providing Mount Vernon with a description of how, when, and where the loss occurred; providing Mount Vernon with an inventory of the damaged property; permitting Mount Vernon to inspect the property to prove the loss; and cooperating with Mount Vernon in the investigation or settlement of a claim. *Id.* ¶ 14.

Under the policy, if Chippewa contracted to repair a covered loss, subsection (a) of the FBVE applied. Subsection (a) of the FBVE provided:

> With respect to the building described in the Declarations, **Section E. Loss Conditions, 7. Valuation**, **items a. and b.** are deleted in their entirety and replaced with the following:
>
>> a. If you contract for repair or replacement of the loss or damage to restore the building shown in the Declarations for the same occupancy and use, within one hundred eighty (180) days of the damage, unless we and you otherwise agree we will pay the smallest of the following:
>>
>>> 1. The Limit of Insurance shown in the Declarations as applicable to the damaged building.
>>>
>>> 2. In the event of a total loss, the cost to replace the damaged building on the same site with a less costly building that is functionally equivalent to the damaged building.
>>>
>>> 3. In the event of a partial loss, the cost to repair or replace the damaged portion of the with less costly material, if available, in the architectural style that existed before the loss or damage occurred.
>>>
>>> 4. The amount you actually spend that is necessary to repair or replace the lost or damaged building with less costly material if available.

*Id.* ¶ 16.

If Chippewa did not contract to repair a covered loss and instead elected to receive a sum of money, subsection (b) of the FBVE applied. Subsection (b) of the FBVE provided:

> With respect to the building described in the Declarations, **Section E. Loss Conditions, 7. Valuation, items a. and b.** are deleted in their entirety and replaced with the following:
>
>> b. If you do not make a claim under a.1, a.2, a.3, or a.4, above, we will pay the smallest of the following, 1., 2., or 3.:
>>
>>> 1. The Limit of Insurance shown in the Declarations as applicable to the damaged building;
>>>
>>> 2. The "market value" of the damaged building, exclusive of the land value, at the time of loss; or

> 3. The amount it would cost to repair or replace the damaged building on the same site, with less costly material in the architectural style that existed before the damage occurred, less allowance for physical deterioration and depreciation.
>
> ****
>
> The following Definition is added to Section E. Loss Conditions, 7. Valuation:
>
> "Market Value", as used in this endorsement, means the price that the property might be expected to realize if offered for sale in a fair market.

*Id.* ¶ 17.

The policy also had provisions regarding appraisals. For example, the policy provided the following:

> If we and you disagree on the value of the property or the amount of loss ("loss"), either may make written demand for an appraisal of the loss ("loss"). In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of the written demand for appraisal. The two appraisers will select an umpire. If they cannot agree upon an umpire within 15 days, we or you may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss ("loss"). If they fail to agree, they will submit their differences to the umpire. The umpire shall make an award within 30 days after the umpire receives the appraisers' submissions of their differences. A decision agreed to by any two will be binding.
>
> Each party will:
>
>   1. Pay its chosen appraiser; and
>   2. Bear the other expenses of the appraisal and umpire equally.
>
> If there is an appraisal, we will still retain our right to deny the claim.

*Id.* ¶ 18.

On October 26, 2021, the building sustained a partial loss as a result of vandalism, specifically, an arson fire to its bell tower. *Id.* ¶ 19. The damage to the building's bell tower caused structural damage and required that the tower be demolished. *Id.* The main portion of the building was also damaged due to smoke and water. *Id.* ¶ 20. On the day of the fire, Chippewa reported the loss to Mount Vernon, and Mount Vernon opened a claim. *Id.* ¶ 21. Upon opening a claim, Mount Vernon retained Signature Adjustment Group (SAG) to begin the process of investigating and adjusting the claim pursuant to the terms of the FBVE. *Id.* ¶ 22. Mount Vernon also retained ProNet Group Inc. to inspect and ensure that the building was fit for

3

repair. *Id*. ¶ 23.  In addition, Mount Vernon retained the real estate firm of Lauer, Jersa & Associates to determine the market value for a functional replacement building. *Id*. ¶ 24.

After beginning its investigation, Mount Vernon informed Chippewa that the adjustment of the claim would likely take several weeks due to the size and complexity of the building, the building's pre-existing and post-loss conditions, and attendant investigations and safety protocols.  *Id*. ¶ 25.  Mount Vernon also advised Chippewa of its duties after a loss and encouraged Chippewa to document its claimed damage (including the cost, value, quantities, and amount of loss) and present it to Mount Vernon as soon as possible.  *Id*. ¶ 26.  Mount Vernon further encouraged Chippewa to begin mitigation procedures to protect the building from further damage.  *Id*.

Chippewa subsequently notified Mount Vernon that it had retained Edwin Claude Inc. to assist in preparing and presenting its claim.  *Id*. ¶ 28.  Pursuant to the engagement agreement between Edwin Claude and Chippewa, Edwin Claude was vested with the sole authority to speak and act on behalf of Chippewa in all matters related to the claim.  *Id*. ¶ 29.  Mount Vernon later inquired with Edwin Claude on the status of a mitigation plan and the presentation of Chippewa's claim.  *Id*. ¶ 30.  Edwin Claude responded by declining mitigation services and refusing to prepare an inventory of the damaged property.  *Id*. ¶ 31.  According to Mount Vernon, Edwin Claude insisted on first seeing Mount Vernon's inventory.  *Id*.  Edwin Claude also demanded immediate payment of the policy's limit of $2,500,000 but reserved Chippewa's "right of election" to have Mount Vernon serve as the general contractor and oversee repairs to the building if Mount Vernon did not offer enough money on the claim.  *Id*. ¶ 32.

Over the course of the next several weeks, the safety and security of the building was assured, and cause and origin investigations were completed.  *Id*. ¶ 33.  SAG then began its inspections and assessment.  *Id*.  SAG's initial assessment suggested that the cost to repair the covered damage was between $800,000 and $1,000,000. Id. ¶ 34.  As of the time of SAG's initial assessment, Edwin Claude remained unwilling to prepare an inventory of the damaged property.  *Id*. ¶ 35.  Edwin Claude also continued to reserve Chippewa's "right of election."  *Id*. ¶ 36.  At some point, Edwin Claude also began demanding an appraisal of the damaged property.  *Id*. ¶¶ 37-38.  Edwin Claude's demands for an appraisal were not, however, accompanied by an identification of a competent and impartial appraiser to serve on Chippewa's behalf.  *Id*.  While Edwin Claude did eventually prepare and present an inventory of the damaged property,

4

according to Mount Vernon, Edwin Claude's inventory failed to account for pre-existing conditions and failed to support a demand for the policy's limit of $2,500,000. *Id*. ¶¶ 39-40.

In January 2022, Lauer, Jersa & Associates submitted its market value report for the building in the amount of $900,000. *Id*. ¶ 42. Mount Vernon was still awaiting a final report from SAG at that time. *Id*. ¶ 43. In March 2022, Mount Vernon elected to move forward with payment of the "undisputed" damages that it believed were owed to Chippewa based on the building's market value. *Id*. ¶ 45. Mount Vernon later issued payment to Edwin Claude in the amount of $875,000, representing the building's market value less Chippewa's deductible. *Id*. ¶ 46. Edwin Claude confirmed the payment but denied its sufficiency, claiming that the actual cash value of the building exceeded the policy's limit of $2,500,000 and that, therefore, Mount Vernon was in breach of the policy. *Id*. ¶ 47.

Thereafter, Mount Vernon received numerous written demands from Edwin Claude for immediate payment of the remaining $1,625,000 that it believes Chippewa is owed under the policy. *Id*. ¶ 48. None of the demands was accompanied by an inventory of the damaged property or an identification of a competent and impartial appraiser. *Id.* ¶ 49. Due to threats of litigation, Mount Vernon filed this action for declaratory judgment on May 31, 2022, seeking a declaration of the parties' rights under the policy. Shortly thereafter, Chippewa produced a market value report for the building prepared by Greater St. Louis Appraisal—a market value report with which Mount Vernon takes issue. *Id*. ¶ 50. Chippewa now moves to dismiss Mount Vernon's complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## LEGAL STANDARD

Rule 12(b)(1) allows a defendant to move to dismiss a complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). In ruling on a motion under Rule 12(b)(1), a court must determine whether the defendant is making a "facial attack" or a "factual attack" on jurisdiction. *Carlsen v. GameStop, Inc*., 833 F.3d 903, 908 (8th Cir. 2016). When a defendant makes a facial attack, a court must look only to "the face of the pleadings," and the plaintiff receives the benefit of Rule 12(b)(6)'s safeguards. *Id*. When a defendant makes a factual attack, on the other hand, a court may consider "matters outside the pleadings," and the plaintiff does not receive the benefit of Rule 12(b)(6)'s safeguards. *Id*.

Rule 12(b)(6) allows a defendant to test the legal sufficiency of a complaint. In ruling on a motion under Rule 12(b)(6), a court must accept all factual allegations in the complaint as true

and view them in the light most favorable to the plaintiff. *Hager v. Arkansas Dept. of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). A court may not, however, "presume the truth of legal conclusions couched as factual allegations." *Id*. To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need not provide "detailed factual allegations" but must provide "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible on its face when the plaintiff pleads sufficient facts to allow the court to draw "the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## DISCUSSION

### A.     Rule 12(b)(1)

Chippewa states in its motion that it moves to dismiss Mount Vernon's complaint pursuant to Rule 12(b)(1), but it does not provide any discussion in its memorandum in support of its motion as to why such a dismissal is warranted. Nevertheless, to the extent Chippewa moves to dismiss Mount Vernon's complaint pursuant to Rule 12(b)(1), its motion will be denied because this Court has subject matter jurisdiction under 28 U.S.C. § 1332, and an actual controversy exists within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201.[2]

1.  28 U.S.C. § 1332

Diversity jurisdiction under 28 U.S.C. § 1332 exists in all civil actions in which there is "complete diversity of citizenship" and the amount in controversy exceeds $75,000. *In re Prempro Prods. Liab. Litig.,* 591 F.3d 613, 619 (8th Cir. 2010) (citing 28 U.S.C. § 1332(a)). Complete diversity requires that "'no defendant holds citizenship in the same state where any plaintiff holds citizenship.'" *Id*. at 620 (quoting *OnePoint Sols., LLC v. Borchert*, 486 F.3d 342, 346 (8th Cir. 2007)). As for the amount in controversy, in a declaratory judgment action where an insurer sues an insured to determine its obligations, "'the amount in controversy ordinarily equals the probable costs of defense and indemnification … less any applicable deductible.'" *American Family Mut. Ins. Co. v. Vein Ctrs. for Excellence, Inc.,* 912 F.3d 1076, 1081 (8th Cir. 2019) (quoting *Scottsdale Ins. Co. v. Universal Crop Prot. All., LLC*, 620 F.3d 926, 932 (8th Cir. 2010)).

---

[2] In its complaint, Mount Vernon alleges that this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 and the Declaratory Judgment Act, 28 U.S.C. § 2201. The Court notes that the Declaratory Judgment Act is "a procedural statute, not a jurisdictional statute." *State of Mo. ex rel. Mo. Highway & Transp. Comm'n v. Cuffley*, 112 F.3d 1332, 1334 (8th Cir. 1997).

Diversity jurisdiction exists in this case because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.  There is complete diversity of citizenship because Mount Vernon is a citizen of Nebraska and Pennsylvania, and Chippewa is a citizen of Missouri.  *See* 28 U.S.C. § 1332(c)(1) (stating, for purposes of diversity jurisdiction, a corporation is a citizen of every state in which it is incorporated and the sole state in which it has its principal place of business); *GMAC Com. Credit LLC v. Dillard Dept. Stores, Inc.*, 357 F.3d 827, 829 (8th Cir. 2004) (holding "an LLC's citizenship is that of its members for diversity jurisdiction purposes"); Doc. 1 ¶ 1 ("Mount Vernon … is a Nebraska corporation with its principle [sic] place of business in Pennsylvania."); Doc. [18] ("Gurpreet S. Padda is the sole member of Chippewa ….  Gurpreet S. Padda's state of citizenship in [sic] Missouri.").  The amount in controversy exceeds $75,000 because the dispute in this case is whether Chippewa is owed $1,625,000 under the policy.

2.  28 U.S.C. § 2201

The Declaratory Judgment Act recognizes that a federal court's exercise of judicial power under Article III of the Constitution "depends on the existence of a case or controversy," and it contains an express limitation to cases "of actual controversy."  *Ringo v. Lombardi*, 677 F.3d 793, 796 (8th Cir. 2012) (internal quotation marks omitted); 28 U.S.C. § 2201.  "The test to determine whether there is an actual controversy within the meaning of the Declaratory Judgment Act is whether 'there is a substantial controversy between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  *Marine Equip. Mgmt. Co. v. United States*, 4 F.3d 643, 646 (8th Cir. 1993) (quoting *Caldwell v. Gurley Ref. Co.*, 755 F.2d 645, 649 (8th Cir. 1985)).  "Because the test to determine the existence of a 'substantial controversy' is imprecise, the decision of whether such controversy exists is made upon the facts on a case by case basis."  *Id*. (citing *Golden v. Zwickler*, 394 U.S. 103, 108 (1969)).

An actual controversy within the meaning of the Declaratory Judgment Act exists in this case.  Chippewa has made several demands on Mount Vernon for immediate payment of the remaining $1,625,000 that it believes is owed under the policy.  *See* Doc. 1 ¶ 48 ("Mount Vernon . . . has received more than twenty (20) written demands from . . . Edwin Claude for the immediate payment of the remaining $1.625 million.").  Mount Vernon contends that it has fulfilled its obligations under the policy and that, therefore, it does not owe Chippewa

7

$1,625,000. *See id.* ¶ 51 ("Mount Vernon now comes to this Honorable Court and seeks a judicial declaration that the company has fulfilled its obligations to [Chippewa]."). In the words of the Eighth Circuit: "The lines are drawn, the parties are at odds, the dispute is real." *Capital Indem. Corp. v. Miles*, 978 F.2d 437, 438 (8th Cir. 1992); *see also id.* (an insurer who denies that coverage exists under a policy will often "bring an action for a declaratory judgment that it will have no duty to indemnify").

### B.     Rule 12(b)(6)

Chippewa's motion also cites Rule 12(b)(6) as a basis for dismissal of Mount Vernon's complaint. Chippewa's memorandum in support contains no more discussion of Rule 12(b)(6) than it did of Rule 12(b)(1). Nevertheless, upon review of Chippewa's memorandum in support, it is clear that dismissal pursuant to Rule 12(b)(6) would be improper.

Chippewa makes two primary arguments. First, Chippewa argues that the FVBE in the policy is not applicable in this case and that Mount Vernon has engaged in bad faith and vexatious refusal. Second, Chippewa argues that its market value report prepared by Greater St. Louis Appraisal is reliable and accurate, while Mount Vernon's market value report is inherently flawed and filled with inaccuracies. Such arguments are not appropriate at the motion to dismiss stage because: (1) the policy is not the record before the Court; and (2) they relate to factual disputes, which cannot be adjudicated on a motion to dismiss where the Court must accept all factual allegations in the complaint as true and view them in the light most favorable to Mount Vernon. *See Hager*, 735 F.3d at 1013.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Chippewa Loft LLC's Motion to Dismiss (Doc. [9]) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff Mount Vernon Specialty Insurance Company's Motion to Stay (Doc. [24]) is **DENIED** as moot.

Dated this 29th day of March, 2023.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE