IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| MOUNT VERNON SPECIALTY INSURANCE COMPANY, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No. 4:22-cv-00583-SEP<br>)<br>) |
| CHIPPEWA LOFT, LLC, | )<br>) |
| Defendants. | ) |

## PLAINTIFF MOUNT VERNON SPECIALTY INSURANCE COMPANY'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS

COMES NOW Plaintiff, Mount Vernon Specialty Insurance Company (hereinafter referred to as "Mount Vernon"), pursuant to Local Rule 4.01(E) and for its Statement of Uncontroverted Material Facts in Support of its Motion for Summary Judgment states to this Honorable Court the following:

### *Insurance Policy Issued to Chippewa Loft, LLC*

1. Mount Vernon issued Chippewa Loft, LLC (hereinafter "Defendant") a Surplus Lines policy, policy no. DPS400875B (hereinafter "the Policy") insuring a vacant church at 500 N. Kingshighway Boulevard, St. Louis, Missouri, 63108 (hereinafter "the Property" or "the damaged building"). The Policy is attached hereto as **Exhibit 1** and fully incorporated herein.

2. The Policy's effective period was from November 27, 2020 to November 27, 2021. (Ex. 1, p. 0001).

3. The Policy insured the Property under its "Building" Coverage for a limit of two million and five hundred thousand dollars ($2,500,000) with a deductible of $25,000. (Ex. 1, p. 0003).

4. In the event of a loss, the Policy requires Defendant's cooperation with Mount Vernon. In relevant part, the Policy states:

> **3. Duties in the Event of Loss or Damage**
>
> a. You must see that the following are done in the event of loss or damage to Covered Property:
>
> …
>
> (5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values, and amount of loss claimed.
>
> …
>
> (8) Cooperate with us in the investigation or settlement of the claim.

(Ex. 1, p. 0040).

5. The Policy contains two pages of declarations and endorsements, stating "The following forms apply to the Commercial Property Coverage part;" Form CP 109, "Functional Building Valuation," is included in this list of endorsements. (Ex. 1, p. 0001-0002).

6. The Functional Building Valuation Endorsement (hereinafter "FBVE") precedes all other endorsements within the Policy as well as the Policy's general coverage part. (Ex. 1. p. 0006).

7. The FBVE states, in bold, outlined text: "This endorsement modifies insurance provided under the following: **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**". (Ex. 1, p. 0006) (emphasis in original).

8. Pursuant to the express terms of the policy, if the insured contracts to repair the damages resulting from a covered loss, subsection (a) of the FBVE provides the following:

With respect to the building described in the Declarations, **Section E. Loss Conditions, 7. Valuation**, items **a** and **b** are deleted in their entirety and replaced with the following:

    a.    If you contract for repair or replacement of the loss or damage to restore the building shown in the Declarations for the same occupancy and use, within one hundred eighty days (180) days of the damage, unless we and you otherwise agree we will pay the smallest of the following:

        1.    The Limit of Insurance shown in the Declarations as applicable to the damaged building.

        2.    In the event of a total loss, the cost to replace the damaged building on the same site with a less costly building that is functionally equivalent to the damaged building.

        3.    In the event of a partial loss, the cost to repair or replace the damaged portion of the building with less costly material, if available, in the architectural style that existed before the loss or damage occurred.

        4.    The amount you actually spend that is necessary to repair or replace the lost or damaged building with less costly material if available.

(Ex. 1, p. 0006).

    9.    However, if the insured does not contract to repair the damages caused by the covered loss within 180 days of the loss and instead elects to receive a sum of money for the damages, subsection (b) of the FBVE provides the following:

With respect to the building described in the Declarations, **Section E. Loss Conditions, 7. Valuation**, items **a** and **b** are deleted in their entirety and replaced with the following:

    b.    If you do not make a claim under a.1, a.2, a.3, or a.4, above, we will pay the smallest of the following, 1, 2, or 3:

3

1. The Limit of Insurance shown in the Declarations as applicable to the damaged building;

2. The "market value" of the damaged building, exclusive of the land value, at the time of loss; or,

3. The amount it would cost to repair or replace the damaged building on the same site, with less costly material in the architectural style that existed before the damage occurred, less allowance for physical deterioration and depreciation.

(Ex. 1, p. 0006).

10. The FBVE defines "market value" as "the price that the property might be expected to realize if offered for sale in a fair market." (Ex. 1, p. 0007).

11. The FBVE replaces the Policy's Building and Personal Property Coverage Section **E. Loss Conditions, 7. Valuation**, items **a**. and **b**. Item a. is the Policy's "actual cash value" valuation provision and item b. is the "replacement cost value" provision. These provisions state:

**7. Valuation**

We will determine the value of the Covered Property in the event of loss or damage as follows:

a. At actual cash value as of the time of loss or damage, except as provided in b., c., d., and e. below.

b. If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

4

> However, the following property will be valued at the actual cash value even when attached to the building:
>
> (1) Awnings or floor coverings;
>
> (2) Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or
>
> (3) Outdoor equipment or furniture.

(Ex. 1, p. 0042).

12. The Policy's Building and Personal Property Coverage form defines "Building" as "meaning the building or structure described in the Declarations." (Ex. 1, p. 0031).

13. The Policy also defines "Depreciation" as "a decrease in value because of age, wear, obsolescence or market value and includes: a) the cost of materials, labor and services; b) any applicable taxes; and c) profit and overhead: necessary to repair, rebuild or replace lost or damaged property." (Ex. 1, p. 0020).

*Fire Loss*

14. On October 26, 2021, the Property sustained a partial loss when a fire engulfed its bell tower, causing significant structural damage. ([Doc. 1] ¶ 19; [Doc. 37, Answer] ¶ 19).

15. On October 26, 2021, Defendant reported the loss to Mount Vernon, and Mount Vernon opened a claim, Claim Number K165932. Coverage is not contested. ([Doc. 1] ¶ 21; [Doc. 37, Answer] ¶ 21).

*Adjustment and Investigation of the Loss*

16. Following receipt of Defendant's notice of loss, Mount Vernon retained third-party adjuster Douglas Maestas of Signature Adjustment Group to adjust the loss.

17. Mount Vernon also retained real estate firm Lauer, Jersa & Associates to determine the damaged building's market value at the time of loss. ([Doc. 1] ¶ 24; [Doc. 37, Answer] ¶ 24).

18. Defendant retained public adjuster Paul Abrams of Edwin-Claude, Inc., to assist in preparing and presenting its claim. The agreement between Abrams and Defendant vested Abrams with the sole authority to speak and act on behalf of Defendant in all matters related to this loss and claim. ([Doc. 1] ¶ 28; [Doc. 37, Answer] ¶ 28).

19. Defendant did not attempt to mitigate or remediate any damage to the damaged building other than pumping water out of the basement. A copy of Defendant's Answers to First Interrogatories, #4, is attached hereto as **Exhibit 10.**

20. On November 10, 2021, Mount Vernon sent an email to Defendant including the FBVE language and requesting an estimate for repairs compliant with the FBVE. Defendant and Defendant's public adjuster did not respond to this email until March 7, 2021. A copy of the November 10, 2021 correspondence, with Defendant's later reply, is attached hereto as **Exhibit 2**. (Ex. 2, p. 0006-0011).

21. Mount Vernon again requested an estimate from Defendant on February 24, 2022 as Defendant still had not provided any documentation evidencing the claim's valuation per the Policy's terms. This email noted this request was neither unreasonable nor contrary to the Policy's terms. A copy of the February 24, 2022 correspondence is attached hereto as **Exhibit 3**. (Ex. 3, p. 2).

22. On March 7, Abrams refused to provide a previously requested estimate until he was given "all documents requested in previous emails". A copy of the March 7 correspondence is attached hereto as **Exhibit 4**. (Ex. 4, p. 3).

23. On March 8, Mount Vernon again requested an estimate, noting Defendant had a duty to do so under the Policy's terms. (Ex. 2, p. 0002).

24. On March 17, Abrams submitted via email an estimate prepared by Leonard Masonry for repair of the bell tower. A copy of the Leonard Estimate is attached hereto as **Exhibit 5.**

25. The Leonard Estimate submitted by Abrams estimated the cost to repair the damaged building to like-new condition, not "functional replacement value." ([Doc. 1] ¶ 39; [Doc. 37, Answer] ¶ 39; [Doc. 37, Counterclaim] ¶ 19; [Doc. 40] ¶ 19).

26. In his March 17 email, Abrams, Defendant's sole agent regarding the claim, confirmed the loss falls under Section B and confirmed the Leonard Estimate's valuation was based on "actual cash value", stating: "Since we have not submitted a contract for repair, it would appear that the amount due the insured would be b(1), (2), or (3) [of the FBVE] which appears to be b(1) the Policy Limit of $2.5M, since the FMV [fair market value] of the property and the cost to repair both exceed the policy limit <u>at ACV</u> ["actual cash value"]". A copy of the March 17, 2022 correspondence is attached hereto as **Exhibit 6**. (Ex. 6, p. 1).

27. The Leonard Estimate estimates the cost to rebuild the damaged bell tower at four million four hundred and fifty-five thousand and seventy-seven dollars ($4,455,077).. (Ex. 5, p. 1).

28. The Leonard Estimate itemizes the rebuild of the damaged bell tower as follows:
   **Demolition - $1,725,202**

7

...

**Rebuild of Bell Tower - $2,729,875**

1. LM to rebuild bell tower to existing height and width of approximately 120' x 25' on each side.
2. LM to rebuild tower using new brick up to 500,000 units.
3. LM to match as close as possible new brick to existing building.
4. LM to build tower walls to the existing thickness of 32".
5. LM to install salvaged stone pieces at prior locations.
6. LM to install new Terra Cotta pieces at top of tower, amount not to exceed $381,500.
7. LM to clean rebuilt tower with masonry detergents.
8. Water to be supplied by building owner within 100' of work area.

(Ex. 5, p. 1).

29. The Leonard Estimate further states: "Newer and more modern methods of construction using an engineered steel frame structure with a single course of brick veneer could possibly lower the rebuild construction costs to between 1.7 and 2.7 million dollars." (Ex. 5, p. 2).

30. Mount Vernon requested a compliant estimate on March 18, 2022. On March 19, 2022, Defendant's public adjuster again refused to submit a compliant estimate, specifically stating:

   a. "On 99+% of all the losses I handle, the insurers never demand an estimate from me or my clients… Does your client demand estimates… from all their insureds on all claims or just ones with public adjuster [sic] or just ones with me?"

   b. "Where in the policy does it require that the insured and/or its public adjuster submit an estimate… and does this insurer require this of each and every insured?"

8

c. "This is not what I find in the policy. What if [sic] found is a section that appears to be directed at personal property, because it references an "inventory" not an estimate. Personal property is inventoried, building damages are not. I searched the policy and can't find the phrase "complete estimate"."

A copy of the March 19, 2022 email and its related replies is attached hereto as **Exhibit 7**. (Ex. 7, p. 0008-0010).

31. Mount Vernon's counsel again requested compliant forms on March 21, 2022. That same evening, Defendant's public adjuster again denied that the Leonard Estimate was non-compliant and refused to submit any other estimate, stating "We have submitted our estimate in the same" when a complete estimate with the requisite information under the Policy was requested. (Ex. 7, p. 0005).

32. On April 1, 2022, Mount Vernon rejected Defendant's proof of loss and estimate for noncompliance with the Policy's valuation terms and requested compliant documentation. A copy of the April 1, 2022 correspondence is attached hereto as **Exhibit 8**.

33. In May 2022, Abrams submitted a Market Value Report prepared by Greater St. Louis Appraisal. Defendant's Market Value Report is incorporated herein as **Exhibit 9.**

34. Defendant's Market Value Report valued the entire property at two million nine hundred thousand twenty-five dollars ($2,925,000). (Ex. 9, p. 3).

35. Defendant's Market Value Report lists its "date of value" as April 14, 2022. (Ex. 9, p. 3).

36. In May 2022, Mount Vernon issued a good-faith payment of $875,000, representing the undisputed minimum damages per Mount Vernon's investigation, and specifically not

precluding any further recovery under the Policy. Abrams confirmed receipt but denied the payment's sufficiency. ([Doc. 1] ¶ 47; [Doc. 37, Answer] ¶ 47; [Doc. 37, Counterclaim] ¶ 12; [Doc. 40] ¶ 12).

37. Defendant did not contract for repair within 180 days, and Defendant does not dispute FBVE Section B governs valuation and payment on the relevant claim. ([Doc. 37, Counterclaim] ¶ 7; [Doc. 40] ¶ 7).

Respectfully submitted,

**RYNEARSON, SUESS, SCHNURBUSCH & CHAMPION L.L.C**

 */s/ Ellen J. Brooke*
Ellen Jean Brooke#58901MO
Katherine M. Smith#57881MO
Collin D. McCabe#74754MO
500 N. Broadway, Suite 1550
St. Louis, Missouri 63102
Phone: (314) 421-4430
Fax: (314) 421-4431
ebrooke@rssclaw.com
ksmith@rssclaw.com
cmccabe@rssclaw.com
*Attorneys for Plaintiff Mount Vernon Specialty Insurance Company*