**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MOUNT VERNON SPECIALTY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | Case No. 4:22-cv-00583-SEP |
| | ) | |
| CHIPPEWA LOFT LLC, | ) ) | |
| Defendant. | ) | |

## <u>MEMORANDUM AND ORDER</u>

Before the Court are Plaintiff's Motion for Summary Judgment, Doc. [49], and Motion to Deem Facts Admitted, Doc. [63].  For the reasons set forth below, both motions are granted.

### FACTS[1] AND BACKGROUND[2]

This case arises out of a fire that damaged a vacant stone and masonry church in St. Louis, Missouri, owned by Defendant Chippewa Loft, LLC.  Doc. [1] ¶¶ 6-10.  On October 26, 2021, the building sustained a partial loss when a fire engulfed its bell tower.  Doc. [50] ¶ 14.

On November 27, 2020, Mount Vernon issued an insurance policy—Policy No. DPS400875B—to Chippewa, insuring the building for $2,500,000 with a deductible of $25,000, from November 27, 2020, through November 27, 2021.  *Id*. ¶¶ 1-3.  In the event of a loss involving the insured property, the Policy requires the insured to perform certain duties after loss as conditions precedent to coverage, including cooperation with Mount Vernon during the investigation and settlement of the claim.  *Id*. ¶ 4.  In relevant part, the Policy states:

**Duties in the Event of Loss of Damage**

a. You must see that the following are done in the event of loss or damage to Covered Property:

\*\*\*

(5) At our request, give us complete inventories of the damaged and undamaged property.  Include quantities, costs, values, and amount of loss claimed.

\*\*\*

(8) Cooperate with us in the investigation or settlement of the claim.

*Id*. ¶ 4; Doc. [50-1] at 40.

The Policy contains a two-page list of declarations and endorsements, under the statement: "The following forms apply to the Commercial Property Coverage part."  Doc. [50] ¶ 5.  Form CP 109, "Functional Building Valuation," is included in the list of endorsements.  *Id*. The Functional Building Valuation Endorsement (FBVE) replaced the Policy's original valuation provisions, which were an "actual cash value" valuation provision and a "replacement cost" valuation provision.  *Id*. ¶ 10.  The FBVE employs a "functional replacement" valuation method for calculating the value of repair costs, rather than "replacement cost" or "actual cash value." *Id*. ¶¶ 11, 25.  Under the FBVE, in the case of a partial loss, a functional replacement of the damaged property must be utilized, as opposed to an identical replacement.  *Id*.

The heading of the FBVE reads: "This endorsement modifies insurance provided under the following:  **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**."  *Id*. ¶ 7; Doc. [50-1] at 6.  Under the express terms of the Policy, if Chippewa contracted to repair a covered loss, subsection (a) of the FBVE provides:

> With respect to the building described in the Declarations, **Section E. Loss Conditions, 7. Valuation**, **items a.** and **b.** are deleted in their entirety and replaced with the following:
>
> > a. If you contract for repair or replacement of the loss or damage to restore the building shown in the Declarations for the same occupancy and use, within one hundred eighty (180) days of the damage, unless we and you otherwise agree we will pay the smallest of the following:
> >
> > > 1. The Limit of Insurance shown in the Declarations as applicable to the damaged building.
> > >
> > > 2. In the event of a total loss, the cost to replace the damaged building on the same site with a less costly building that is functionally equivalent to the damaged building.
> > >
> > > 3. In the event of a partial loss, the cost to repair or replace the damaged portion of the building with less costly material, if available, in the architectural style that existed before the loss or damage occurred.
> > >
> > > 4. The amount you actually spend that is necessary to repair or replace the lost or damaged building with less costly material if available.

Doc. [50] ¶ 8.

Under the Policy, if, as happened here, Chippewa did not contract to repair a covered loss within 180 days of the loss and instead elected to receive a cash settlement, subsection (b) of the FBVE would have applied, which provides:

2

With respect to the building described in the Declarations, **Section E. Loss Conditions, 7. Valuation, items a. and b.** are deleted in their entirety and replaced with the following:

b. If you do not make a claim under a.1, a.2, a.3, or a.4, above, we will pay the smallest of the following, 1., 2., or 3.:

1. The Limit of Insurance shown in the Declarations as applicable to the damaged building;

2. The "market value" of the damaged building, exclusive of the land value, at the time of loss; or

3. The amount it would cost to repair or replace the damaged building on the same site, with less costly material in the architectural style that existed before the damage occurred, less allowance for physical deterioration and depreciation.

\*\*\*

The following Definition is added to Section E. Loss Conditions, 7. Valuation:

"Market Value", as used in this endorsement, means the price that the property might be expected to realize if offered for sale in a fair market.

*Id*. ¶¶ 9-10; Doc. [50-1] at 6.  Mount Vernon now concedes that the FBVE "is the appropriate formula to be used for loss valuation."  Doc. [69] at 2; *see also* Doc. [50] ¶ 37 ("Defendant does not dispute FBVE Section B governs valuation and payment on the relevant claim.").

On the day the building's bell tower burned, Chippewa reported the loss to Mount Vernon, and Mount Vernon opened Claim K165932.  *Id*. ¶ 15.  Upon opening the claim, Mount Vernon retained third-party adjuster Douglas Maestas of Signature Adjustment Group to begin the process of investigating and adjusting the claim.  *Id*. ¶ 16.  In addition, Mount Vernon retained the real estate firm of Lauer, Jersa & Associates to determine the building's market value at the time of loss.  *Id*. ¶ 17.

Chippewa retained public adjuster Paul Abrams of Edwin-Claude, Inc., to assist in preparing and presenting its claim.  *Id*. ¶ 18.  Pursuant to the engagement agreement between Edwin-Claude and Chippewa, Abrams was vested with sole authority to speak and act on behalf of Chippewa in all matters related to the claim.  *Id*.

On November 10, 2021, Mount Vernon sent an email to Defendant that included a copy of the entire FBVE endorsement from the Policy and requested a repair estimate that complied with the FBVE.  *Id*. ¶ 20.  On November 11, 2021, Abrams responded with an email that stated merely, "How do these partial provisions affect this claim?"  Doc. [50-2].  Mount Vernon again

3

requested an FBVE-compliant estimate from Defendant on February 24, 2022, as Defendant still had not provided any documentation evidencing the claim's valuation per the Policy's terms. Doc. [50] ¶ 21.  On March 7, 2022, Abrams refused to provide the previously requested estimate until he was given "all documents requested in previous emails."  *Id*. ¶ 22.  On March 8, Mount Vernon again requested an FBVE-compliant estimate, noting that Defendant had a duty to provide such an estimate under the Policy's express terms.  *Id*. ¶ 23.

On March 18,  2022,[3] Abrams emailed Plaintiff an estimate prepared by Leonard Masonry for repair of the bell tower.  *Id*. ¶ 24.  Leonard Masonry estimated the cost of demolition and rebuilding of the bell tower at $4,455,077 and noted that its estimated rebuild would use brick that matched the existing building "as close as possible," and contemplated rebuilding the tower walls "to the existing thickness of 32 [inches]."  *Id*. ¶¶ 27-28; Doc. [50-5] at 1.  The Leonard Masonry estimate further stated that "[n]ewer and more modern methods of construction using an engineered steel frame structure with a single course of brick veneer could possibly lower the rebuild construction costs to between 1.7 and 2.7 million dollars."  *Id*. ¶ 29. The Leonard Masonry estimate did not use the "functional replacement value" required under the Policy, but rather, contemplated an identical replacement akin to a "like-new" state.  *Id*. ¶ 25.

In the March 18th email, Abrams acknowledged that the loss fell under Subsection (b) of the FBVE, but also confirmed that the Leonard Masonry estimate's valuation was based on "actual cash value," stating:  "Since we have not submitted a contract for repair, it would appear that the amount due the insured would be b(1), (2), or (3) [of the FBVE] which appears to be b(1), the Policy Limit of $2.5M, since the FMV [fair market value] of the property and the cost to repair both exceed the policy limit at ACV ["actual cash value"]" valuation.  *Id*. ¶ 26.  Use of an "actual cash value" valuation is explicitly prohibited by the terms of the Policy.  *Id*. ¶ 11.

On March 18, 2022, Mount Vernon again requested an estimate that was compliant with the Policy's FBVE, and Defendant's adjustor again failed to provide a compliant estimate.  *Id*. ¶ 30.  On March 21, 2022, Mount Vernon yet again requested a compliant estimate, and that evening Defendant's adjustor responded that the Leonard Masonry estimate was the only one it would be submitting.  *Id*. ¶ 31.  On April 1, 2022, Mount Vernon rejected Defendant's proof of loss and estimate due to noncompliance with the Policy's valuation terms and again requested compliant documentation.  *Id*. ¶ 32.

4

In May 2022, Abrams submitted, on behalf of Defendant, a Market Value Report prepared by Greater St. Louis Appraisal, which valued the entire property at $2,925,000. *Id*. ¶¶ 33-35.  Defendant's Market Value Report states that its "date of value" was April 14, 2022.  *Id*. ¶ 35.

In January 2022, Lauer, Jersa & Associates submitted its market value report for the building in the amount of $900,000.  Doc. [1] ¶ 42.  In May 2022, Mount Vernon elected to move forward with payment of the minimum undisputed damages it believed were owed to Chippewa based on the building's market value (minus the $25,000 deductible) and issued a payment of $875,000.  Doc. [50] ¶ 36.  Abrams confirmed receipt of the payment but denied its sufficiency, claiming that the actual cash value of the building exceeded the policy's limit of $2,500,000, and therefore, Mount Vernon was in breach of the policy.  *Id*.

Thereafter, Mount Vernon received numerous written demands from Edwin-Claude for immediate payment of the remaining $1,625,000 that it asserts Chippewa is owed under the Policy.  Doc. [1] ¶ 48; Doc. [50] ¶¶ 20-26, 30-34.  Mount Vernon subsequently filed this action for declaratory judgment, seeking a declaration of the parties' rights under the Policy.  Plaintiff now moves for summary judgment, Doc. [49], and seeks a judicial declaration that the FBVE is valid, enforceable, and applicable to the fire loss associated with Claim K165932; that Defendant failed to fulfill its duties under the Policy to cooperate and submit FBVE compliant estimates; that Plaintiff's payment of $875,000, as based on the market value report of Lauer, Jersa & Associates complies with the plain and ordinary language of the FBVE; and that Mount Vernon has fulfilled its obligations under the Policy through its payment to Defendant of $875,000, and Plaintiff owes no further duty to Defendant under the Policy.  Defendant filed a memorandum in opposition, Doc. [69], Plaintiff replied, Doc. [71], and the motion is ripe for resolution.

### LEGAL STANDARD[4]

A court must grant a motion for summary judgment if it finds, based on the factual record, that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56.  Material facts are those that "might affect the outcome of the suit under the governing law," and there is a genuine dispute where "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

5

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (quotation marks omitted). The burden then shifts to the non-movant to "present specific evidence, beyond 'mere denials or allegations [that] . . . raise a genuine issue for trial.'" *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019) (quoting *Wingate v. Gage Cnty. Sch. Dist., No. 34*, 528 F.3d 1074, 1078-79 (8th Cir. 2008)). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The evidence must be viewed "in the light most favorable to, and making all reasonable inferences for, the nonmoving party." *Carmody v. Kansas City Bd. of Police Comm'rs*, 713 F.3d 401, 404 (8th Cir. 2013). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). "'If reasonable minds could differ as to the import of the evidence,' summary judgment is inappropriate." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986)).

**DISCUSSION**

## I. The FBVE applies to Defendant's claim and Defendant failed to comply with the FBVE's valuation requirements.

As noted above, Defendant does not dispute that the FBVE is the appropriate formula for loss valuation in this matter.[5] *See* Doc. [69] at 2. Defendant also concedes that, because it opted for a cash settlement, Section B of FBVE applies, pursuant to which Plaintiff is obligated to pay the lowest of the three options described in Section B: "(1) the limit of insurance, (2) the market value of the damaged building (exclusive of land value) at the time of the loss; or (3) the cost to repair the damaged building on the same site with less expensive materials, maintaining the architectural style that existed before the damage, while accounting for physical deterioration and depreciation." *Id*. In light of Defendant's concession, there is no genuine dispute of material fact on this point, and the Court grants Plaintiff's motion with respect to its request for a

declaration that Section B of the FBVE is valid, enforceable, and applicable to the fire loss associated with Claim K165932  The Court turns now to whether Defendant's proffered valuations, as submitted to Plaintiff, complied with the Policy's FBVE requirements.

Because this case is in federal court based on diversity jurisdiction, Missouri's substantive law controls the Court's analysis.  *See Jerry's Enters., Inc. v. U.S. Specialty Ins.*, 845 F.3d 883, 887 (8th Cir. 2017).  Under Missouri law, after a loss an insured must apprise the insurer of damages and the insurer's duty to pay those damages in terms compliant with the applicable policy valuation provisions.  *See West v. Shelter Mut. Ins. Co.*, 864 S.W.2d 458, 461 (Mo. Ct. App. 1993).  Missouri courts commonly find that an insured's failure to produce requested documents or the provision of insufficient responses to requests for information is a breach of an applicable policy's cooperation clause.  *See e.g., Northrup Grumman Guidance and Elec. Co., Inc. v. Empl. Ins. Co. of Wausau*, 612 S.W.3d 1 (Mo. Ct. App. 2020); *see also Union Ins. Co. of Providence v. Williams,* 261 F.Supp.2d 1150, 1152 (holding that cooperation clauses are valid and enforceable under Missouri law).  In the event of a partial loss, "the burden is on the insured to prove the value of the property both before and after the casualty."  *Wells v. Missouri Property Ins. Placement Facility*, 653 S.W.2d 207, 211 (Mo. Banc 1983).  Valuation of a loss is determined pursuant to the insurance contract's provisions.  *See Nelson v. Farm Bureau Town and Country Ins. Co. of Missouri*, 560 S.W.3d 81, 87 (Mo. Ct. App. 2018); *Williams v. Farm Bureau Mut. Ins. Co. of Mo.*, 299 S.W.2d 587, 588-89 (Mo. Ct. App. 1957) (where the policy valuation provision required valuation based on replacement or repair, the insured violated policy requirements when it provided estimate based only on replacement and not repair).  So, under Missouri law and the Policy requirements, Defendant bears the burden of proving the loss's valuation in a manner compliant with the Policy.

Here, the parties agree that Section B of the FBVE provides the relevant valuation formula.  Section B of the FBVE states that Mount Vernon will pay the smallest of the three options described in Sections B.1, B.2, or B.3, and the insured is required to present valuations compliant with the FBVE options so that Mount Vernon could determine which was smallest. The first option, described in Section B.1, is simply the policy limit, and that amount is undisputedly $2,500,000.

The second option, described in Section B.2, is "the market value of the damaged building (exclusive of land value) at the time of the loss."  Doc. [50] ¶ 9.  So, to comply with the

7

FBVE, Defendant was required to present Plaintiff with the "market value" of the building "at the time of the loss." *Id.* Defendant submitted a market value report in May 2022, which valued the property at $2,925,000, and which explicitly stated that the "date of value" was April 14, 2022. *Id.* ¶¶ 33-35. But the time of loss was in 2021. *Id.* ¶ 9. Under Missouri law, if a policy's language, given its plain and ordinary meaning, is clear and unambiguous, "courts enforce the policy as written." *Bar Plan Mut. Ins. Co. v. Chesterfield Mgmt. Assocs.*, 407 S.W.3d 621, 628 (Mo. Ct. App. 2013) (citing *Am. Fam. Mut. Ins. Co. v. St. Clair*, 295 S.W.3d 586, 591 (Mo. Ct. App. 2009)). Here, the FBVE clearly and unambiguously requires that Defendant proffer the market value of the building "at the time of the loss," and it failed to do so. Therefore, there is no genuine dispute of material fact that Defendant's market value report is not compliant with the valuation conditions of Section B.2 of the Policy.

The third option, described in Section B.3, is the functional replacement option, described as the "amount it would cost to repair or replace the damaged building on the same site, with less costly material in the architectural style that existed before the damage occurred, less allowance for physical deterioration and depreciation." Doc. [50] ¶ 9. So, pursuant to the plain and unambiguous language of the Policy terms, Section B.3 requires that Defendant present a valuation that demonstrates the estimated cost to construct an architecturally similar but less costly structure, as opposed to an identical replacement.

When Defendant's adjuster submitted the Leonard Masonry estimate, he described it as being based on an "actual cash value" valuation standard, rather than the standard set forth in Section B.3 of the FBVE. *See* Doc. [50] ¶¶ 24-26. As explained above, the FBVE replaced the Policy's original "actual cash value" valuation provision with the FBVE. *Id.* ¶ 10. And a review of the Leonard Masonry estimate confirms that the cost of repair found therein is not based on a functional replacement but instead contemplates a replacement that is nearly identical to the original structure prior to the fire. The Leonard Masonry estimate states that it would cost $4,455,077 to rebuild the tower in a method that matches "as close as possible" the existing building, including rebuilding the brick tower walls "to the existing thickness of 32 [inches]." *Id.* ¶ 28. The Leonard Masonry estimate explicitly acknowledges that there exist cheaper alternative replacement options that could reduce the construction cost by millions of dollars, for example, utilizing "newer and more modern methods of construction using an engineered steel frame with a single course of brick veneer." *Id.* ¶ 29. Such a cheaper alternative appears

8

congruent with Section B.3's functional replacement valuation method, described as the "amount it would cost to repair or replace the damaged building on the same site, with less costly material in the architectural style that existed." *Id*. ¶ 9. But Defendant never submitted an estimate using a similar cheaper method of replacement. Considering that Defendant's adjuster admitted that the Leonard Masonry estimate was based on the no longer applicable "actual cash value" standard, and because the estimate fails to estimate the cost to construct an architecturally similar but cheaper structure, as required by the FBVE, the Court concludes that Defendant's Leonard Masonry estimate is not compliant with the valuation conditions of Section B3 of the FBVE.

Defendant, in its memorandum in opposition to Plaintiff's motion, argues that Plaintiff failed to explain to Defendant what was required under the FBVE. *See* Doc. [69] at 2. But Missouri courts have consistently disclaimed an insurer's duty to advise the insured on the terms of an insurance policy; rather, the insured has an obligation to read and understand the terms of his policy. *Wilmering v. Lexington Ins. Co.*, 678 S.W.2d 865, 872 (Mo. Ct. App. 1984) ("[A]n insurance agent or broker does not have an obligation to explain the policy to the insured."); *In re Brauer v. Bankers Life and Cas. Co.*, 2016 WL 4083480, at *2 (W.D. Mo. Aug. 1, 2016) (same). Furthermore, insureds in Missouri are generally bound by all of a policy's provisions, exclusions, and endorsements, whether they have read the policy or not. *See State Auto Prop. & Cas. Ins. Co. v. Boardwalk Apartments, L.C.*, 572 F.3d 511, 515 (8th Cir. 2009); *Busey Truck Equip., Inc. v. Am. Fam. Mut. Ins. Co.*, 299 S.W.3d 735, 738 (Mo. Ct. App. 2009). And in any event, it is undisputed that Plaintiff provided Defendant with a copy of the FBVE, along with an explanation of its requirements, on November 10, 2021. *See* Docs. [50] ¶ 20; [50-2] at 6-10.

Defendant also repeatedly insists that the valuation documentation it provided to Plaintiff was "valid" and "relevant." Doc. [69] at 4, 6, 8-9, 12. But Defendant's subjective belief that its documentation was "valid" and "relevant" does not matter; what matters is whether the documentation was *compliant* with the terms of the FBVE. As discussed above, an insured in Missouri has a duty to submit documentation that complies with a policy's requirements. Defendant cites no caselaw[6] explaining how submitting "valid" or "relevant" material is legally salient when that material is not compliant with the unambiguous terms of the Policy.

Finally, Defendant argues that it provided Plaintiff with a listing brochure and an executed sales contract for the property, each of which purportedly established the market value of the property. *See* Doc. [69] at 8-9, 11-12. The listing brochure was developed to assist with

9

sale of the property and listed its market price as $2.955 million. *See* Doc. [69-3]. The sales contract was dated July 9, 2021, and was for $2.955 million. *Id*. Notably, Defendant argues only that these valuation documents establish the property's market value; it does not argue that they do so in a manner compliant with Section B.2 of the FBVE. Nor could it. The brochure, though undated, was prepared to assist in the sale of the property, and the sales contract was entered into months before the loss, not "at the time of the loss," as required by the FBVE.

More to the point, both documents clearly contemplate the value of an undamaged building, including the entire land value, whereas Section B.2 of the Policy requires Defendant to establish market value "of the *damaged* building (*exclusive* of land value)." Doc. [50] ¶ 9 (emphasis added). The sales contract was for the sale of "an interest in certain real estate, including buildings, parking lot, and improvements thereon, the easements, access rights, and appurtenances and hereditaments thereto." *See* Doc. [69-3]. And the brochure listed not just the building, but highlighted the inclusion of 1.22 acres of land, including a .46-acre parking lot. *Id*. Neither document complies with the Policy's requirement that a proffered market value report include only the value of the damaged building, minus the land value, at the time of loss. Thus, these materials do not give rise to a genuine dispute of material fact as to whether Defendant's valuation proffer complied with the FBVE. The Court concludes that there is no dispute of material fact that Defendant violated the Policy's cooperation clause by failing to proffer any damage valuation that complied with the FBVE, and that the failure to do so was a material breach of the Policy.

## II.    Mt. Vernon is entitled to deny further coverage under the Policy due to Defendant's breach of the cooperation clause.

The plain and unambiguous language of the Policy requires Defendant's cooperation as a condition precedent to recovery. *See* Doc. [50] ¶ 4. Missouri courts consistently find that an insured's failure to assist in investigation of a claim by apprising the insurer of damages in a manner compliant with the policy constitutes a material breach of the cooperation clause and precludes coverage. *See, e.g.*, *Roller v. Am. Mod. Home Ins. Co.*, 484 S.W.3d 110, 116 (Mo. Ct. App. 2015) (citing *Union Ins. Co. of Providence v. Williams*, 261 F. Supp. 2d 1150, 1152 (E.D. Mo. 2003)). "Cooperation clauses are designed to 'enable the [insurance] company to possess itself of all knowledge, and all information as to other sources of knowledge, in regard to facts, material to their rights, to enable them to decide upon their obligations, and to protect them

10

against false claims.'" *Chaudhri v. State Auto Prop. & Cas. Ins. Co.*, 2019 WL 1519307, at *3 (W.D. Mo. Apr. 8, 2019) (quoting *Wiles v. Cap. Indem. Corp.*, 215 F. Supp. 2d 1029, 1032 (E.D. Mo. 2001) (citation modified).  "Once the insurer proves the material breach of a cooperation clause, the insurer may deny liability coverage under the policy." *Union Ins.*, 261 F. Supp. 2d at 1152.

To successfully deny coverage, the insurer must show "(1) the existence of substantial prejudice and (2) the exercise of reasonable diligence to secure the insured's cooperation." *Id*. Substantial prejudice is "established when the insured fails to comply with a reasonable request [for information] because the insured has 'perhaps the greatest knowledge of the circumstances[.]'" *Roller*, 484 S.W.3d at 116 (quoting *In re Am. Wood Concepts, LLC,* 2010 WL 1609690, at *4 (Bankr. W.D. Mo. Apr. 20, 2010)); *see also Riffe v. Peeler*, 684 S.W.2d 539, 543 (Mo. Ct. App. 1984) (An insurer may demonstrate substantial prejudice by, among other things, a repeated course of noncooperation by the insured, including the insured's failure to comply with the insurer's request for information about damages.).  Here, as more thoroughly discussed above, the record clearly demonstrates Plaintiff's attempts to secure the information it needed to evaluate Defendant's claim.  Mt. Vernon informed Defendant numerous times of its duties under the Policy, yet Defendant repeatedly failed to provide compliant valuation documentation.  *See* Doc. [50] ¶¶ 20-23; 30-32.  Missouri courts have held that refusing to cooperate by supplying requested documents "is clearly prejudicial." *Wiles*, 215 F. Supp. 2d at 1032 (applying Missouri law).  The Court thus concludes that Mt. Vernon has shown that it was prejudiced by Defendant's noncooperation.

Additionally, the insurer  must prove that it exercised reasonable diligence to secure the cooperation of the insured. *Union Ins.*, 261 F. Supp. 2d at 1152.  An insurer may, pursuant to Missouri law, show reasonable diligence by "contact[ing] the insured multiple times to secure [its] cooperation." *Med. Protective Co. v. Bubenik*, 594 F.3d 1047, 1051 (8th Cir. 2010) (citing *Colson v. Lloyd's of London*, 435 S.W.2d 42, 25 (Mo. Ct. App. 1968)).  Mt. Vernon's repeated attempts to elicit compliant documentation demonstrates its reasonable diligence in attempting to secure Defendant's cooperation. *Id*.

## CONCLUSION

Because the undisputed record demonstrates that Defendant materially breached the Policy's cooperation clause by failing to submit its damages in a form compliant with the

11

Policy's terms, Mt. Vernon exercised reasonable diligence in requesting Defendant's cooperation, and Mt. Vernon was prejudiced as a result of Defendant's breach of the Policy's terms, Mt. Vernon is entitled to judgment as a matter of law.  *See McClune v. Farmers Ins. Co.* 12 F.4th 845, 849 (8th Cir. 2021); *Hendrix v. Jones*, 580 S.W.2d 740, 742 (Mo. 1979).  The Court therefore grants the judicial declaration Mt. Vernon seeks, and hereby finds that (1) the FBVE is valid, enforceable, and applicable to the fire loss associated with Claim K165932; (2) Defendant failed to fulfill its duties under the Policy to cooperate and submit FBVE compliant estimates; (3) Plaintiff's payment of $875,000, as based on the market value report of Lauer, Jersa & Associates complies with the plain and ordinary language of the FBVE; (4) Mount Vernon has fulfilled its obligations under the Policy through its payment to Defendant of $875,000, and (5) Plaintiff owes no further duty to Defendant under the Policy.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment, Doc. [49] is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Deem Facts Admitted, Doc. [63] is **GRANTED**.

A separate Judgment will accompany this Memorandum and Order.

Dated this 31st day of March, 2026.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE

---

[1] Plaintiff filed its Motion for Summary Judgment and accompanying Statement of Undisputed Material Facts on January 8, 2024.  *See* Docs. [49], [50].  Defendant's response was due no later than February 7, 2024.  *See* Doc. [45] at 2.  On February 7, 2024, Defendant filed a Motion to Stay Filing of Summary Judgment Response.  *See* Doc. [55].  The Court denied that motion for failure to state good cause and ordered Defendant to respond to Plaintiff's Motion for Summary Judgment by no later than February 21, 2024.  *See* Doc. [60].  Defendant did not timely respond, and on February 23, 2024, Plaintiff filed a Motion to Deem Facts Admitted.  *See* Doc. [63].  On February 25, 2024, Defendant responded in opposition, stating that its attorney, Harjot Padda, developed a "medical condition" in February 2024 that impacted his ability to perform tasks such as getting ready in the morning and driving.  *See* Doc. [65]. The motion did not explain how the medical condition prevented Defendant from timely filing a simple motion for extension of time to respond.  *Id*.

Under both the Federal Rules of Civil Procedure and the Local Rules of this District, when a party moves for summary judgment, an opposing party is obligated to respond in a timely manner.  *See* FED. R. CIV. P. 56(c)(1); E.D. MO. L.R. 4.01(E).  When a nonmoving party does not respond to a moving party's statement of uncontroverted facts, the court may consider those facts undisputed for the purposes of the

motion. FED. R. CIV. P. 56(e)(2), (e)(3). Here, Defendant's failure to timely respond is of a piece with its failure to meaningfully engage with this litigation at every stage. Plaintiff filed this action on May 31, 2022. *See* Doc. [1]. On April 25, 2023, after 11 months with no answer from Defendant, Plaintiff filed a motion for clerk's default. *See* Doc. [31]. On May 1, 2023, the Court ordered Defendant to file an Answer by no later than May 12, 2023. *See* Doc. [32]. On May 12, 2023, Defendant answered and brought a counterclaim for vexatious refusal. *See* Doc. [37]. Defendant then failed to respond to Plaintiff's motion to dismiss Defendant's counterclaim, which the Court granted. *See* Doc. [75]. Defendant also never provided Rule 26 disclosures, *see* Doc. [34] at 4, and did not seek any discovery, Doc. [56] at 5.

Considering all of the above, the Court grants Plaintiff's motion to deem facts admitted pursuant to Rule 56(e). *See Jenkins v. N. Cnty. Gen. Surgery*, 2022 WL 3107231, at *1 (E.D. Mo. Aug. 4, 2022) (deeming all facts from the moving party's statement of uncontroverted material facts admitted because non-moving plaintiff failed to timely respond to the moving party's facts) (citing L.R. 4.01(E)).

[2] Certain information in this factual summary is drawn from the allegations in Plaintiff's Complaint, Doc. [1], and is provided solely for context; the Court treats none of the allegations in the Complaint as proven. Conversely, facts taken from Plaintiff's Statement of Uncontroverted Material Facts, Doc. [50], are deemed admitted for purposes of summary judgment. *See supra* note 1.

[3] The Statement of Uncontroverted Material Facts provides a date of March 17, Doc. [50] ¶ 24, but the exhibit containing the email message indicates that it was sent on March 18, Doc. [50-6] at 1.

[4] In its Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, Defendant asserts that the legal standard for summary judgment under Rule 74.04 of "Missouri's fact-pleading regime" is applicable here. Doc. [69] at 4. To the contrary, "federal courts sitting in diversity apply state substantive law and federal procedural law," *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996), and therefore, the familiar standard under Federal Rule of Civil Procedure 56 applies to Plaintiff's motion.

[5] This is a notable departure from Defendant's prior stance. Throughout the course of this litigation, Defendant has maintained that the FBVE did not apply to its loss. *See* Docs. [10] at 1, 13 (arguing that Plaintiff's claim that the FBVE applied to its claim is "completely untrue" and that Plaintiff's argument to the contrary was made in "bad faith"); [37] at 12-13 (insisting that the Policy does not use a "Functional Building Valuation"). This was a point of such contention that Plaintiff devoted approximately six pages of its opening Memorandum in Support of its Motion for Summary Judgment solely to establishing that the FBVE was the applicable loss valuation formula under the Policy. *See* Doc. [51] at 4-10.

[6] The Court notes that the argument section of Defendant's Memorandum in Opposition to Summary Judgment, Doc. [69], is devoid of citation to supporting caselaw.

13